UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA
Alexandria Division

UNITED STATES OF AMERICA,          )
                                   )
            v.                     )
                                   )
TERRY W. MILLENDER                 )
                                   )          Case No. 1:16-cr-239-1 & 2 (AJT)
            and                    )
                                   )
BRENDA MILLENDER,                  )
                                   )
            Defendants.            )
_____)

## AMENDED MEMORANDUM OPINION and ORDER[1]

On December 18, 2017, after an eight day jury trial, Defendant Terry Millender was

convicted on 31 counts: two counts of conspiracy to commit wire fraud, 12 counts of wire fraud,

two counts of conspiracy to commit money laundering, 11 counts of money laundering, two

counts of filing a false tax return, one count of aiding and assisting the filing of a false tax return

and one count of obstruction of an official proceeding.[2] At that same trial, Defendant Brenda

Millender was convicted on seven counts: two counts of conspiracy to commit wire fraud, two

counts of conspiracy to commit money laundering and three counts of money laundering.[3]

---

[1] This Amended Memorandum Opinion and Order replaces the Memorandum Opinion and Order dated September 21, 2018 [Doc. No. 201] (which inadvertently omitted to list on page 24 Counts 11 and 19 among those counts vacated as to defendant Brenda Millender).
[2] Defendant Terry Millender was convicted as follows: Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 (Counts 1 and 15); Wire Fraud in violation of 18 U.S.C. § 1343 (Counts 2–10 and 16–18); Conspiracy to Commit "promotional," "concealment," "transportation," and "excess monetary transactions" Money Laundering in violation of 18 U.S.C. §§ 1956(h), (a)(1)(A)(i), (a)(1)(B)(i), (a)(2)(B)(i), and 1957 (Counts 11 and 19); Money Laundering in violation of 18 U.S.C. § 1956(a)(2)(A) and 2 (Count 12); Money Laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 2 (Counts 13–14 and 20–27); Filing of False Tax Returns in violation of 26 U.S.C. § 7206(1) (Counts 28–29); Aiding and Assisting in the Preparation of False Tax Returns in violation of 26 U.S.C. § 7206 (2) (Count 30); Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2) (Count 31).
[3] Defendant Brenda Millender was convicted as follows: Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 (Counts 1 and 15); Conspiracy to Commit "Promotional" Money Laundering in violation of 18 U.S.C. §§ 1956(h), and (a)(1)(A)(i) (Count 11); Conspiracy to Commit "promotional" and "concealment" Money

1

Pending before the Court are Defendant Terry Millender's Motion for Judgment of Acquittal [Doc. No. 153][4] and Defendant Brenda Millender's Motion for Judgment of Acquittal, or in the Alternative Motion for New Trial [Doc. No. 155] (collectively, "the Motions").

For the reasons stated below, the evidence against Terry Millender was sufficient to sustain his convictions on all counts except Counts 13, 14 and 20–27 pertaining to concealment money laundering. As to Brenda Millender, the evidence was insufficient as a matter of law to establish that she knew that funds were fraudulently obtained from the victims of the charged schemes and therefore insufficient to sustain any of her convictions. Accordingly, Defendant Terry Millender's Motion is GRANTED in Part and DENIED in part; and Defendant Brenda Millender's Motion is GRANTED.

## BACKGROUND

On October 20, 2016, a nineteen count indictment was issued against Defendants Terry Millender, Brenda Millender, and Grenetta Wells.[5] On June 29, 2017, a 31 count superseding indictment was issued against Mr. and Mrs. Millender [Doc. No. 60].[6] Beginning on December 6, 2017, the case was tried before a jury as to Mr. and Mrs. Millender. On December 18, 2017,

---

Laundering in violation of 18 U.S.C. §§ 1956(h), (a)(1)(A)(i) and 1956(a)(1)(B)(i) (Count 19); Money Laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i) and 2 (Counts 21, 22, and 27).

[4] Although his Motion, by its terms, challenges all of his convictions, Defendant Terry Millender has not argued substantively in either his briefings or at the hearing on the Motions that the evidence was insufficient to sustain his convictions on Counts 28–29 (Filing of False Tax Returns, 26 U.S.C. § 7206(1)); Count 30 (Aiding and Assisting in the Preparation of False Tax Returns, 26 U.S.C. § 7206(2)); or Count 31 (Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2)). Any challenge to those convictions are therefore deemed withdrawn.

[5] The original indictment charges as follow: (1) Conspiracy to Commit Wire Fraud in violation of 18 U.S.C. § 1349 (Count 1); (2) Wire Fraud in violation of 18 U.S.C. § 1343 (Counts 2–10); (3) Money Laundering Conspiracy in violation of 18 U.S.C. § 1956(h) (Count 11); (4) money laundering in violation of 18 U.S.C. § 1956 (Counts 12–14); (5) Filing a False Tax Return in violation of 26 U.S.C. § 7206(1) (Counts 15–16); (6) Aiding and Assisting in the Preparation of a False Tax Return in violation of 26 U.S.C. § 7206(2) (Count 17); and (7) Obstruction of an Official Proceeding in violation of 18 U.S.C. § 1512(c)(2) (Counts 18–19). Mr. Millender was charged in Counts 1–18, Mrs. Millender, in Counts 1–11; and Wells, Counts 1–11, and 19 [Doc. No. 1]. On January 11, 2017, pursuant to a plea agreement, Wells pleaded guilty to one count of conspiracy to commit wire fraud.

[6] The superseding indictment charged both Mr. and Mrs. Millender with eight additional counts of money laundering in violation of 18 U.S.C. § 1956, one additional count of money laundering conspiracy in violation of 18 U.S.C. § 1956(h), and three additional counts of wire fraud in violation of 18 U.S.C. § 1343. On June 23, 2017, Mr. Millender moved for dismissal of Counts 1–10 and 15 of the original indictment for lack of timeliness [Doc. No. 48], which the Court denied on November 14, 2017 [Doc. No. 97].

the jury found Mr. Millender guilty on all counts of the superseding indictment and Mrs. Millender guilty of two counts of conspiracy to commit wire fraud (Counts 1 and 15), two counts of conspiracy to commit money laundering (Counts 11 and 19), and three counts of money laundering (Counts 21, 22 and 27).

## LEGAL STANDARD

"[T]he relevant question [on a Rule 29 motion] is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). It is the sole providence of the jury to "weigh[] the credibility of the evidence and resolve[] any conflicts in the evidence presented." *United States v. Murphy*, 35 F.3d 143, 148 (4th Cir. 1994). The Court, therefore, must "assume that the jury resolved all contradictions in the testimony in favor of the government." *United States v. Moye*, 454 F.3d 390, 394 (4th Cir. 2006) (citation omitted). Additionally, the Government need not provide direct evidence for each element of the charged offenses; "circumstantial evidence . . . may be sufficient to support a guilty verdict even though it does not exclude very reasonable hypothesis consistent with innocence." *United States v. Jackson*, 863 F.2d 1168, 1173 (4th Cir. 1989). When, as in this case, a motion for judgment of acquittal is made at the close of the Government's case and the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved. Fed. R. Crim. P. 29(b).

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." But in considering whether to grant a new trial, "the district court should only overturn a jury verdict in the 'rare circumstance' when the verdict is against the great weight of the evidence." *United*

*States v. Garcia*, 855 F.3d 615 (4th Cir. 2017) (internal citation omitted). "[A]ny error sufficient to require a reversal on appeal is an adequate ground for granting a new trial." 3 Wright & Miller, Fed. Prac. & Proc. Crim. § 589.

## ANALYSIS

As alleged in the superseding indictment, and as proven at trial, Micro-Enterprise Management Group ("MEMG") was created in June 2008 purportedly for the purpose of helping the poor in developing countries by providing "micro-loans," i.e., small, short-term loans to entrepreneurs who wished to start or expand existing businesses by working with a network of established micro–finance institutions. Kingdom Commodities Unlimited ("KCU") was created in April 2013, ostensibly for the purpose of brokering Nigerian oil deals. Defendant Terry Millender was a senior pastor and founder of the Victorious Life Church ("VLC"), located in Alexandria, Virginia. He was also a founding member and Chief Executive Officer ("CEO") of MEMG and the CEO of KCU.

Defendant Brenda Millender is the wife of Terry Millender and the "First Lady" of VLC. She was also listed as a founding member and registered agent of MEMG.

Grenetta Wells was also a member of VLC and was Chief Operating Officer and International Project Director for MEMG. She was also the owner and president of Golden Strategies, LLC, a Delaware company formed in February 2009, through which she opened trading accounts to buy and sell stock options using lenders' money. Prior to trial, Wells pleaded guilty to conspiracy to commit wire fraud and testified at the Millenders' trial as a cooperating co-conspirator pursuant to her plea agreement.

1. **The Defendants' convictions for conspiracy to commit wire fraud (Counts 1 and 15) and Terry Millender's convictions for wire fraud (Counts 2–10; 16–18)**

4

Both Defendants were convicted of conspiracy to commit wire fraud through MEMG (Count 1) and also through KCU (Count 15). In addition, Terry Millender was convicted of 11 counts of wire (Counts 2–10, 16–18). Brenda Millender was acquitted on those same wire fraud counts.

In order to convict the Defendants of conspiracy to commit wire fraud, the Government was required to prove as to each: (1) a conspiracy to commit wire fraud was formed, reached or entered into by two or more persons; (2) at some time during the life or existence of the conspiracy, the defendant knew the purpose of the agreement; and (3) with knowledge of the purposes of the conspiracy, the defendant then deliberately joined the conspiracy, agreement or understanding. *See* [Doc. No. 146–7] ("Jury Instruction No. 46"). However, mere association with someone involved in the conspiracy or even knowledge or approval of the conspiracy, without knowing participation, is insufficient to support a conviction. *See United States v. Wilson*, 484 F,3d 267, 280 (4th Cir. 2007) ("mere presence or association was insufficient to prove knowing participation in a conspiracy); *United States v. Webb*, 359 F.2d 558, 562 (6th Cir. 1966) ("[N]either association with conspirators nor knowledge that something illegal is going on by themselves constitutes proofs or participation in a conspiracy.") (citing *United States v. Falcone*, 311 U.S. 205 (1940)); *United States v. Bostic*, 480 F.2d 965, 967 (6th Cir. 1973) ("Mere knowledge or approval, without participation, does not make one a party to a conspiracy.").

In order to convict Mr. Millender of wire fraud, the Government was required to prove as to each instance alleged in Counts 2–10 and 16–18 that: (1) he knowingly devised or knowingly participated in a scheme or artifice to defraud and to obtain money or property by means of material false or fraudulent pretenses, representations, or promises; (2) the scheme or artifice to

defraud, and pretenses, representation, or promises were material, that is, they would reasonably influence a person to part with money or property; (3) he did so with the intent to defraud; and (4) in advancing, or furthering, or carrying out this scheme to defraud, and scheme to obtain money or property by means of false or fraudulent pretenses, representations, or promises, he transmitted any writing, signal, or sound by means of a wire, radio, or television communication in interstate commerce or caused the transmission of any writing, signal, or sound of some kind by means of a wire, radio, or television communication in interstate commerce. *See* [Doc. No. 146–7] ("Jury Instruction No. 49").

As to Terry Millender, the evidence is clearly sufficient to sustain his convictions on both conspiracy counts and the substantive wire fraud counts. Briefly summarized, the evidence established that Mr. Millender conceived of the idea of making micro-loans to entrepreneurs in Africa, to borrow money from lenders with promises of very high rates of return, and to generate the money sufficient to make the micro-loans and the promised rates of return through profits generated from trading of the borrowed funds on the foreign exchange market, and latter, through brokering Nigerian oil deals. In order to implement his schemes, he formed MEMG in June, 2008, which was used as the entity through which he solicited and managed the borrowed funds, which were initially to be repaid with the promised interest within three years. In August, 2008, he organized Exchange Access International, LLC ("EAI"), a foreign corporation organized under the laws of Nevis, which was nominally owned by a non-American citizen in order to obtain favorable tax treatment for the profits realized from foreign exchange trading ("FOREX trading") through that entity. In April, 2013, he organized KCU, through which he solicited loans ostensibly for the purpose of participating in Nigerian oil deals.

The general outlines of his projects were, for the most part, disclosed to the people from whom he solicited funds, including that the promised high rates of return would be generated through FOREX trading or Nigerian oil trades.[7] The solicitations were otherwise grossly inadequate. The risks associated with FOREX trading were not adequately disclosed; and the victims were provided false and misleading information, both orally and in writing, including, *inter alia*, that the loans were risk free, "guaranteed" and secured by non-existent "reserves." The loaned funds were to be used to support individuals in developing countries; and the written materials provided to lenders falsely represented that MEMG had a history of making micro-loans in Africa and had established relationships with on-going projects.

Over the course of time, MEMG lost money through FOREX trading and Wells' day-trading in the stock market through Golden Strategies; no micro-loans were ever in fact made; no oil deals were ever consummated; and a substantial portion of the victims' funds were used to pay for the personal expenses of the Millenders. With few exceptions, investors were not repaid any portion of either their principal or the promised interest. Information concerning these matters was concealed from the victims, who were further mislead with false or incomplete information when the promised repayments were not forthcoming.

Although Mr. Millender considered that his "business model" included a distribution to him for "business expenses," which in his view included expenses that benefited the Millenders personally, he never disclosed to lenders that a portion of their funds would be used in that fashion. Throughout, Mr. Millender, described in promotional materials as a "proven business prodigy," in fact, had no experience or background in the highly volatile and risky foreign

---

[7] Grenetta Wells testified that she always disclosed to potential lenders the role of foreign exchange trading, something that was confirmed by a number of the lenders who testified at trial. Nevertheless, some lenders testified that they were not told or did not understand the role that FOREX trading played; and while some promotional materials referenced EAI, the role that FOREX trading played with respect to MEMG's ability to pay the promised returns was not explicitly discussed in the promotional brochures that were created.

exchange markets, provided lenders with glowing, optimistic and baseless reports on MEMG; and when FOREX trading resulted in losses, he formed KCU, with the same general idea as he had for MEMG, but this time, the funds necessary to repay KCU lenders (and the high promised rates of return) would be generated not from FOREX trading but by brokering Nigerian oil deals, in which he also had no track record of success or experience.

The whole misconceived enterprise was a failure from the beginning. While some profits were generated through FOREX trading, and then latter, through day trading through Wells' Golden Strategies, overall, there were trading losses and neither MEMG nor KCU were able to generate the promised returns. None of the funds were used to make any micro-loans; no oil deals were consummated.

Mr. Millender devised and was the moving force, leader and manager of the fraudulent scheme involving both MEMG and KCU. He was intimately involved in all aspects of both, which he effectively controlled and directed. He personally solicited lenders as well as others who acted as promoters of the scheme. He reviewed and approved all of the informational brochures and documents for investors that contained false and misleading information; and clearly knew that some of the representations used to solicit borrowed funds were false or misleading.[8] As the fortunes of MEMG and KCU deteriorated, he and Wells actively and knowingly concealed the fraudulent nature of the schemes through both MEMG and KCU, and

---

[8] Co-conspirator Grenetta Wells described at trial Mr. Millender's role as follows:

Terry Millender was the leader. He was the lead, CEO of – – I understood him to be the main lead for Micro-Enterprise. He was the main decision maker. He solicited and received funds from lenders. He was the one responsible for paying commissions to consultants, paying me. He was responsible for making sure that everything was moving, when to talk to people, when to communicate with people, leading the calls, the meetings and giving, you know, overall direction.

[Doc. No. 165], Day 3 Trial. Tr. at 166:15-23.

Wells further testified that she did not feel comfortable making any decisions about MEMG without consulting Terry Millender and that she would go to him for direction if she had any questions. *Id.* at 166:24–167:4.

engaged in further misrepresentations in order to induce lenders to either part with more money or not press for repayment.[9]

The evidence is clearly sufficient to establish that Mr. Millender and Grenetta Wells, both of whom knew that their solicitations contained untrue and misleading claims and promises, knowingly participated in a conspiracy for the purposes of fraudulently soliciting lenders through first, MEMG and then, KCU and that Mr. Millender committed the charged offenses of wire fraud..

The evidence against Brenda Millender was quite different. First, there was no evidence that she played any role in conceiving or understanding the scheme or the "business model" used to solicit borrowed funds. Unlike Mr. Millender, Grenetta Wells and others, she was not listed in promotional materials as associated in any way with MEMG. There is no evidence that she was involved in generating any promotional materials or had ever seen the promotional materials provided to potential lenders. There is no evidence that she solicited lenders or was present for any in-person solicitations with investors. The only solicitation she witnessed was as a passenger in Mr. Millender's car in August 2008 when she heard his telephone pitch to D.L., after which she expressed her opinion that it was a good opportunity. More importantly, there is no evidence

---

[9] Mr. Millender's principal defense is that he "got ahead of himself" in using lender funds for personal expenses before those funds generated profits and that overall he lacked the required scienter because of his good intentions. *See* Mr. Millender Mot. at 1 (arguing that he "does not deny owing money to lenders, just that he had no criminal intent throughout this business venture" and that while there was evidence, principally from Wells, that she and Mr. Millender made misrepresentations, they nevertheless "wanted MEMG to work . . . wanted to repay lenders their principal and interest and that they discussed getting more money into the foreign exchange market to accomplish that... [and] that the [KCU] part of the case represented a promising way to try and get lenders repaid"). Those claimed good intentions notwithstanding, there is substantial evidence that both Mr. Millender and Wells knew that the information being provided to investors was incomplete, false and misleading. *See United States v. Godwin*, 272 F.3d 659, 667 (4th Cir. 2001) (finding "a reasonable jury could conclude that even if [defendants] had originally harbored good intentions, when their financial expectations soured they engaged in fraudulent activity to placate unhappy investors and prolong their scheme to defraud."); *see also United States v. Curry*, 461 F.3d 452, 458 (4th Cir. 2006) ("Moreover, even if an individual had an innocent intent at the outset, a mail or wire fraud conviction can be sustained if that individual used the mails or wire communication to disseminate falsehoods designed to calm nervous buyers, as [defendant] did here.").

that she had any knowledge that anything being told to lenders, including to D.L., was false or misleading, either as to MEMG or KCU.

The evidence was also insufficient to establish that she had communications with Mr. Millender, or anyone else, that placed her on notice of any fraud or misinformation to investors. None of the relatively few emails between Mr. Millender and others on which Mrs. Millender was copied or responded to contains information that alerted her to fraud; rather, the emails which she received or replied to underscored the viability of the Mr. Millender's efforts and his *bona fides.* In short, there is no evidence that Mrs. Millender ever received any information different than what Mr. Millender and Wells were optimistically telling lenders.

There is evidence that Mrs. Millender became more "vocal" and involved in MEMG and KCU related matters after she learned around September 2012 that investors were not being repaid; but her learning that Mr. Millender's efforts had proven unsuccessful and there were lender losses was unaccompanied by sufficient evidence from which to infer that she had known or then learned that the loans had been obtained fraudulently. In that regard, the only evidence pertaining to the purpose of her involvement was provided by Grenetta Wells, who testified that Mrs. Millender wanted to do whatever she could to get the lenders re-paid. There is no evidence, however, that even as she engaged in those efforts she learned or understood the fraudulent nature of the scheme that resulted in those non-payments. As the jury concluded in acquitting her on all substantive wire fraud counts, her level of involvement and knowledge was insufficient to impose any criminal liability on her for any of the charged substantive wire fraud offenses, either as to MEMG or KCU;[11] and while no overt act on her part is necessary to sustain her convictions

---

[11] In Counts 2–10 and 16-18, the Superseding Indictment charged that she and Mr. Millender "knowingly devised a scheme and artifice to defraud, and to obtain money and property, by means of materially false and fraudulent pretenses, representation and material omissions, . . . [and] for the purpose of executing the scheme and artifice to

for conspiracy to commit wire fraud, the lack of any substantial evidence concerning her substantive involvement in the charged wire fraud associated with the schemes also reflects the lack of evidence concerning her knowledge of any conspiracy or its purposes or that she deliberately joined a conspiracy with knowledge of its fraudulent purpose. In short, there was no substantial evidence sufficient for a reasonable juror to find that she knowingly joined any conspiracy to defraud investors through either MEMG or KCU.

In support of its contention that Mrs. Millender played a "supporting role" sufficient to sustain her convictions, the Government points to evidence pertaining to (1) her formal association with MEMG when it was first created; (2) her role as the "first lady" of VLC; (3) her receiving or drawing on funds from MEMG and KCU bank accounts; (4) her role in providing to one investor what the Government refers to as a "lulling" payment; (5) her role in the affairs of MEMG and KCU, as described by Grenetta Wells; and (6) false statements made in a joint bankruptcy proceeding. The Court has reviewed that evidence in detail and concludes that none of the evidence in these categories, either alone or collectively, provide evidence sufficient to establish knowledge on her part of the fraudulent nature of Mr. Millender's schemes, the alleged conspiracies or her knowing participating in those conspiracies.

### (1) Mrs. Millender's involvement with MEMG when it was first formed; and (2) Mrs. Millender's role as the "first lady" of VLC

Mr. Millender formed MEMG in June, 2008, at which time he listed as members, i.e., owners, along with himself, Mrs. Millender and their daughter. Mrs. Millender was also listed as a registered agent, with the Millenders' then residence as the business address of MEMG. She was also listed as an authorized signatory on a MEMG bank account. Other than being listed as described above, there is no evidence that she played any other role in the creation of MEMG.

---

defraud, and to aid and abet the same," sent certain emails and text messages. Superseding Indictment at 20. In Counts 12–18, the Superseding Indictment made similar allegations with respect her involvement with KCU.

As to KCU, she was not listed as a member or in any other capacity or role in the formal filing creating KCU. She was not listed as an authorized signatory on any KCU bank accounts.

There was no evidence that Mrs. Millender was involved in the creation or review of any promotional materials or any discussions or other efforts related to devising or structuring the micro-loan project to be executed through MEMG or the Nigerian oil deals through KCU. With the exception of Wells' testimony (discussed below), and the emails referred to above, there is also no evidence of any conversations or other communications between Mrs. Millender and Mr. Millender, or anyone else, concerning MEMG or KCU or how those entities would be used.[12] There is no evidence that she had anything to do with FOREX trading or Nigerian oil trading, or that she knew anything about those subjects.

During the solicitation of lenders, Mr. Millender went on promotional trips to Ukraine, Jamaica, Africa and elsewhere. While Grenetta Wells and others accompanied Mr. Millender on those trips, including persons whom the Government effectively concedes had no knowledge of the fraudulent nature of MEMG or KCU, Mrs. Millender did not. She did accompany her husband on at least one trip to Florida, but there is no evidence that Mrs. Millender learned or was exposed to anything during that trip that alerted her to the fraudulent nature of her husband's schemes. The victims who testified stated without exception that Mrs. Millender was not involved in their dealings with Mr. Millender when they made their loans and that they had no interactions with her. Overall, other than having been listed on the MEMG documents described above by Mr. Millender, there is no evidence of any involvement by Mrs. Millender in connection with the creation of MEMG or KCU or the promotional schemes they were formed to pursue.

---

[12] Wells testified that she had discussions with Mr. and Mrs. Millender about using MEMG money to day trade. Day 3 Trial. Tr. at 155:10–156:18.

None of the evidence concerning Mrs. Millender's formal association with MEMG or KCU is sufficient to draw an inference that Mrs. Millender knew that MEMG or KCU were being created for the purpose of perpetrating a fraud. As hair brained as the schemes were, Mr. Millender apparently had the persuasive power to convince people, including financially sophisticated individuals,[14] that the schemes were a legitimate "win-win" for everyone involved. Even convicted co-conspirator Grenetta Wells, a formerly licensed securities trader experienced in financial investments, initially thought that MEMG was a legitimate investment opportunity and that there was nothing improper about her involvement.[15]

There is no evidence that Mrs. Millender understood or knew anything different. Mr. Millender had arranged for people to create a website and promotional materials, arranged for respected promoters to locate lenders, and associated with other religious leaders, both in the United States and abroad, in promoting MEMG's project. Others involved in those efforts, including, for example, Lisa Chau, who accompanied Mr. Millender on his trip to Ukraine to find lenders, participated in the creation of promotional materials for MEMG without any contention by the Government that she knew about the fraudulent nature of MEMG and its intended solicitations. There is no evidence that in Mrs. Millender's dealings with Mr. Millender or what she observed in his dealings with others, Mr. Millender was anything other than endlessly optimistic concerning what he portrayed as MEMG's good works, God's blessings

---

[14] These included, among others, Benson Pennick, who acted as a promoter, and John Mumford, a Harvard business school graduate.

[15] As she explained concerning why she initially became involved in MEMG:

> Because I saw it as an opportunity. One, I wanted a job. My job was running out, and I wanted a job. It seemed like a good way to use the skills that I had, administrative, the knowledge of finances, and also to do good by people.

> You know, I trusted Pastor Terry. I trusted him, and I believed in what he was trying to do, and I wanted to be a part. It was a good thing. It looked good, and it seemed like it was going to be a win for everyone involved. And I wanted to be a part of it, it was good to be at a place where I could use my skills to help and get paid.

Day 3 Trial. Tr. at 172:6–17.

upon his good works, and the prospects for success. There was no evidence from which a juror could reasonably infer that Mrs. Millender knew MEMG or KCU was a fraud.

Similarly, the Government in substance argues that by virtue of her position as the first lady of VLC, she was on notice of the fraud associated with MEMG because she knew of the poor financial condition of VCL and therefore knew, or at least had reason to suspect, that MEMG would be used to fraudulently generate money for VLC. But that evidence is likewise insufficient to allow the reasonable inference that Mrs. Millender knew of her husband's conspiracies or that she knowingly joined those conspiracies. Others were charged with the financial management of VLC;[16] and the evidence about Mrs. Millender's position as the "first lady" and an elder of VLC was insufficient to allow the jury to conclude that Mrs. Millender knew of any fraud in connection with the solicitation of funds for either MEMG or KCU, was aware of the alleged conspiracies or participated in them.

### (3) Receiving or drawing on funds from MEMG and KCU bank accounts and (4) "lulling payment"

There is no doubt that Mrs. Millender substantially benefited from the charged fraudulent scheme; a substantial portion of the fraudulently solicited and obtained funds through MEMG and KCU were used to fund the Millenders' personal expenses related to their housing and general lifestyle. There is also no doubt that under certain circumstances evidence that a defendant personally profited from a fraud may provide additional circumstantial evidence of intent to participate in that fraud. *See United States v. Bales*, 813 F.2d 1289, 1294 (4th Cir.1987) ("Fraudulent intent 'may be established by circumstantial evidence and by inferences deduced from facts and situations.'") (citation omitted); *see also United States v. Naranjo*, 634 F.3d 1198,

---

[16] Jackie Jackson, the elder of administration and chief of staff of VLC, testified that while Mrs. Millender knew generally about VCL's financial condition, she and Derrick Jones were responsible for managing the financial affairs of VLC.

1207 (11th Cir. 2011) ("A jury may infer an intent to defraud from the defendant's conduct. Evidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud.") (quotation marks and citations omitted). The issue is whether the evidence that Mrs. Millender benefitted from the fraud is sufficient to establish that she knew of the conspiracies to fraudulently solicit lenders and with that knowledge joined those conspiracies.

The evidence concerning funds paid for the benefit of the Millenders detailed the payments made directly to Mrs. Millender,[17] directly to Mr. Millender, and distributions to third parties, including, among others, the Millenders' landlord. The evidence was otherwise limited. For example, there was no evidence that Mrs. Millender knew either the amount or the source of funds used to pay for her personal residences, which also was used for VLC activities.[18] There was no evidence concerning whether or to what extent Mrs. Millender was aware of the amount

---

[17] In this regard, the Government introduced a series of distribution from MEMG and KCU bank accounts that implicated Mrs. Millender. These include: (1) a MEMG check dated August 12, 2008, signed by Mrs. Millender in the amount of $1,000 payable to the to the order of "Brenda Millender;" (2) checks signed by Mr. Millender payable to Mrs. Millender in amounts of $500 to 1,600, during September, and October 2008, March 2009 to June 2009, December 2009, and January 2010, drawn on the bank accounts of MEMG with notations that the funds were for "consulting fees;" (3) a check dated August 29, 2016,signed by Mr. Millender in the amount of $800, drawn on the bank account of KCU with a notation that the funds were for "consulting svcs;" (4) checks signed by Mr. Millender payable to Mrs. Millender in amounts of $300 to $800, during September, October, and December 2008, drawn on the bank account of MEMG with various notations including reimbursement for travel and expenses; and (5) checks signed by Mr. Millender payable to Mrs. Millender in amounts of $180 to $600, during February, April, June, and August 2014, and December 2015, drawn on the bank account of KCU with notations, including reimbursements for loan payment, salary, travel, and office expenses. Wells also testified that the Mrs. Millender "approved" transfers to Golden Strategies.

[18] A substantial amount of lender funds from both MEMG and KCU were used to pay for the monthly occupancy costs associated with the Millenders' Monroe Drive home and then the Anne Ly Lane home. Mr. Millender had entered into a sales contract to purchase the Monroe Drive home in January, 2008, before the creation of MEMG or any lender solicitations, with a $100,000 down payment. *See* Gov't Ex. E-18-2. When that purchase did not close as scheduled, Mr. Millender entered into an pre-settlement occupancy agreement with the seller for $10,300 per month, which was often paid with MEMG funds. *See* Gov't Ex. B-1-3 ("Pay to the Order of Masoud Jame" checks); *see also* Gov't Ex. E-18-3 ("Pre-Settlement Occupancy Agreement"). After the Millenders were evicted from that home around the fall of 2010, Mr. Millender rented the Anne Ly Lane for $3,975 per month (excluding $50 late fee), which beginning in January, 2014 was largely paid for with KCU funds. *See* Gov't Ex. E-22 (rental application); *see also* B-3-12 ("Pay to Order of Casey N. Margenau & Margenau & Assoc." checks). There is no evidence of Mrs. Millender's involvement with any of those negotiations or transactions; none of the Government's exhibits pertaining to the Monroe Drive home or the Anne Ly Lane were signed or appear to have been distributed to Mrs. Millender; and the occupancy/rent payments were signed solely by Mr. Millender.

of money collected through MEMG and KCU; or that she ever actually ever received or reviewed any of the bank statements.

The evidence was also insufficient to establish that Mrs. Millender knew that the distribution from MEMG to her or her husband were improper or part of the fraudulent scheme. From her perspective, Mrs. Millender knew that Mr. Millender was the organizer and manager of a project that was initially thought by everyone exposed to it to be a legitimate undertaking, albeit with risks that were more appreciated by some than others. From all appearances, Mr. Millender was devoting an enormous amount of time and expense to MEMG affairs. Promoters and others were being paid with respect to work on behalf of MEMG. Moreover, the funds available to Mr. Millender were also bound up with his compensation as pastor, "tithing," and a "housing allowance"[19] he was to receive from VLC; and even before MEMG was organized in June, 2008, benefactors had made substantial gifts to Mr. Millender for his living expenses, including the purchase of a home. Mrs. Millender also had some income from employment unrelated to MEMG or KCU and had on occasion loaned money to those entities (the "Bank of Brenda" testimony); and some of the distributions to her were referenced as loan repayments. In any event, there was no evidence that Mrs. Millender knew or had reason to believe that Mr. Millender was improperly using funds for their personal benefit, or improperly authorizing her to receive the payments she received.

As to the specific benefits she and Mr. Millender received, there was very little evidence concerning any discussions or communications between Mrs. Millender and Mr. Millender, or anyone else, concerning what financial benefits MEMG was entitled to receive as a result of its sponsoring and managing the lenders' funds, or what Mr. Millender for his role as CEO of

---

[19] Jackie Jackson, VLC's financial manager, testified that Mr. Millender was to receive a housing allowance from VCL of $5,500 per month in 2008, latter increased, although it was sometimes not paid for lack of funds.

MEMG or what the other members of MEMG would receive. There is no evidence concerning what the lenders were told about the expenses to be paid from their funds to MEMG, which included payments to promoters, and the only explicit testimony concerning the expenses to be paid from lender funds came from Wells, who as MEMG's Chief Operating Officer and International Director, expected a salary of $5,000 per month:

> Q. Initially, when you were approached about MEMG, were there explicit conversations about using investor funds for personal expenses, for instance ?
> A. What he [Terry Millender] would say was that, yes, the business model called for a percentage of funds to be used for business expenses . . . . He didn't give any details of what business expenses were.

Day 3 Trial Tr. 170:13–23.

The Government points to Wells' testimony that Mr. Millender referenced a lender's money as the source of funds for a shopping trip, that she told Mr. and Mrs. Millender that they should not use any "principal" to purchase furniture for their residence, that Mrs. Millender wanted to be sure that they were using only money that had been "set aside for them," and that Mrs. Millender wanted her share from any consummated oil deal to be segregated from Mr. Millender. But no juror could reasonably find from that evidence that Mrs. Millender knew that the funds had been fraudulently obtained or improperly distributed. Likewise insufficient is the evidence that she "approved" a transfer of funds to Golden Strategies, which, according to the evidence, was explained to her as part of the effort to generate funds with which to repay lenders.[20] Overall, the evidence pertaining to her personal benefits received from lender funds is insufficient to establish that Mrs. Millender knew that a conspiracy to fraudulently obtain funds existed or that she knowingly joined any conspiracy.

---

[20] Mrs. Millender did not sign any check or other instrument transferring those funds; and there is no evidence that she had the authorization to draw on the bank account used to transfer those funds.

Similarly insufficient to establish her knowledge of or knowing participation in the alleged conspiracy as to MEMG was her role in delivering to D.L. what the Government describes as a $2,000 "lulling payment." That payment arose out of discussions between D.L. and Terry Millender; and as far as Mrs. Millender knew, the funds were made after D.L.'s personal pleas to Mr. Millender based on "hardship." This evidence is insufficient to allow a jury to infer that Mrs. Millender understood or even suspected that the payment was being made to avoid detection by law enforcement. There was no evidence D.L. had threatened to go to law enforcement if the money was not paid or said anything to Mrs. Millender that related to any fraud in connection with the original solicitation of her loan.

Based on all the evidence, even when viewed most favorably to the Government, the personal benefits Mrs. Millender received from either MEMG or KCU funds were insufficient to establish that Mrs. Millender knew of any conspiracy to fraudulently obtain or improperly use lender funds, or that she knowingly joined the alleged conspiracies.

### (5) Mrs. Millender's involvement in the conspiracy, as described by Grenetta Wells.

In pre-trial interviews with law enforcement, Grenetta Wells did not identify any actual interactions with Mrs. Millender or claim that she had any substantive involvement or even knowledge of the fraudulent scheme that she and Mr. Millender were involved in. However, at trial, she referenced her interactions with Mrs. Millender in connection with MEMG and KCU. Most of her testimony came in response to the Government's questions about communications or agreements that lumped Mr. and Mrs. Millender together, and her responses did not specifically differentiate between communications between her and Mr. Millender, her and Mrs. Millender, or both together.[21] During cross examination, it became clear that at most, Mrs. Millender was

---

[21] The Government's position that Wells' testified to Mrs. Millender's participation in the "agreement" to defraud lenders is based at its core on the following exchange:

present during certain conversation between Wells and Mr. Millender concerning how to deal with lenders that had asked for re-payment. However, none of those conversations were sufficient to establish that Mrs. Millender, even at that point, learned about the fraudulent nature of Mr. Millender's and Grenetta Wells' activities and with that knowledge joined the conspiracy to further its fraudulent objectives.[22]

### (6) The Joint Bankruptcy Petition

In 2010, Mr. and Mrs. Millender filed a joint petition in bankruptcy which contained false and misleading statements concerning MEMG, including a failure to disclose that they had received funds from MEMG. There was no testimony concerning what role Mrs. Millender played in connection with the preparation of that Bankruptcy Petition. At the Bankruptcy hearing, Mr. Millender provided nearly all of the information to the Court, with Mrs. Millender

---

Q. You mentioned that you conspired with Brenda and Terry Millender. What was your agreement, and what did you agree to do with them?
A. You mean my role with the company?
Q. The role in the conspiracy, what you pled guilty to.
A. Well, I don't understand your question.
Q. Well, what was your agreement with Terry and Brenda Millender? What was the crime you committed as you understand it?
A. Right. Well, you know, from the beginning, there were various misrepresentations and lies to the lenders and potential lenders.
Day 3 Trial Tr. 154:5–18.

[22] When asked to describe specifically Mrs. Millender's role, she testified as follows:
Brenda Millender is the wife and business partner with Terry Millender. She – – even though Terry was the main leader, Brenda's voice – – her review and approval on major decisions was definitely there, and it was understood. He would tell me that it was understood.

She also helped to resolve – – ultimately, when we had issues with how to resolve lender issues and getting their money back, she participated in helping with the solutions, what to do and how to do it.

Over time, meaning once we got beyond just raising funds and funds were no longer there, and people began to request funds, there was – – and even with Golden Strategies with the loss of those funds and OANDA when those funds were lost, by that time, Brenda Millender became more vocal than I had recognized before. She would say, we've got to get these people's money back.

She did approve additional transfers and the Golden strategies, for example. She voiced that. And she wanted to be more involved. She would say, you know, I want to be in the meeting. I need to know what's going on.
Day 3 Trial Tr. 168:12–169:12.

providing a conclusory statement about the accuracy of the Bankruptcy petition. The joint

bankruptcy petition is insufficient to establish that Mrs. Millender knew of the alleged

conspiracies or with knowledge of their fraudulent purposes, joined them.

### 2. Defendants' convictions for conspiracy to commit money laundering (Counts 11 and 19) and money laundering (Counts 12–14, 20–27 as to Terry Millender and Counts 21, 22 and 27 as to Brenda Millender)

Both Defendants were charged with participating in the same two conspiracies to commit

money laundering, one relative to MEMG (Count 11) and one as to KCU (Count 19). Both

Defendants were convicted on the same two counts.[23] However, the jury found that the

conspiracies in which each Defendant participated had a different combination of objectives, that

is, the conspiracy in which Mr. Millender participated involved the existence of an agreement

between two or more persons to commit a different set of offenses than the conspiracy in which

Mrs. Millender participated.[24] In addition, Mr. Millender was convicted of the substantive

offenses of money laundering, as charged in:

    a.   Count 12, charging a violation of 18 U.S.C. § 1956(a)(2)(A) and 2 on November 29, 2011, based on his transmission of "$1,555 from an account in the name of EAI, located in a place outside the United States, to a place inside the United States, that is MEMG's WF [Wells Fargo] account, with the intent to promote the carrying on of specified unlawful activities, that is wire fraud and conspiracy to commit wire fraud;"

---

[23] In order to convict the Defendants of conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h), the Government must prove the following: (1) the existence of an agreement between two or more persons to commit one or more of the substantive money laundering offenses prescribed under 18 U.S.C. § 1956(a) or § 1957; (2) that the defendant knew that the money laundering proceeds had been derived from an illegal activity; and (3) the defendant knowingly and voluntarily became part of the conspiracy. *United States v. Singh*, 518 F.3d 236, 248 (4th Cir. 2008).

[24] In the case of Mr. Millender, the jury convicted him on Count 11 based on a conspiracy to engage in promotional, concealment, and transportation money laundering and also a §1957 offense (engaging in a monetary transactions using criminally derived property in excess of $10,000) and on Count 19 based on a conspiracy to engage in promotional and concealment money laundering and a §1957 offense. On the other hand, the jury convicted Mrs. Millender on Count 11 based on a conspiracy to engage in only promotional money laundering and on Count 19 based on a conspiracy to commit only promotional and concealment money laundering.

b. Counts 13 and 14, charging violations of 18 U.S.C. § 1956(a)(1)(B)(i) and 2 on December 5 and 6, 2011, based on the withdrawal of $100 in cash from MEMG's Wells Fargo account;

c. Counts 20, 23–26, charging violations of 18 U.S.C. §1956(a)(1)(B)(i) and 2 on various dates between May 21, 2013 and December 14, 2015, based on the withdrawal of cash ranging from $402.75 to $4,145 from the KCU Bank of America account; and

d. Counts 21, 22, and 27, charging violations of 18 U.S.C. § 1956(a)(1)(B)(i) and 2 on various dates between February 5, 2014, June 18, 2014 and December 23, 2015, based on checks written to Brenda Millender from the KCU Bank of America account.

Mrs. Millender was acquitted on Counts 12, 13, 14, 20, 23–26, and convicted on Counts 21, 22 and 27.

First, as to Mr. Millender, the evidence was sufficient to sustain his convictions for conspiracy to commit money laundering in Counts 11 and 19 based on an agreement the jury could infer between Mr. Millender and Grenetta Wells as to the use of gross proceeds from their fraudulent solicitations of lenders and the subsequent transfer and use of those lender funds, including payments to promoters.[25] However, as to Mrs. Millender, the evidence was insufficient for the jury to find that she participated in any conspiracy to commit money laundering since, as discussed above, the evidence was insufficient to establish that she knew that the funds involved

---

[25] In *U.S. v Santos*, 553 U.S. 507 (2008), the Supreme Court considered whether the expenses of operating the "specified illegal activity" constituted "proceeds" under 18 USC § 1956. *Id.* at 510. A four justice plurality (together with Justice Stevens who concurred in the judgment) concluded that the expenses of operating a criminal activity, in that case, illegal gambling, did not since to rule otherwise would lead to the so-called "merger problem" where the defendant would be convicted of the substantive offense of unlawful activity and then convicted again under section 1956 of money laundering for the "the mere payment of the expense of operating" the underlying criminal enterprise. Many lower courts subsequently understood *Santos* to mean that only net receipts i.e. profits of specified unlawful activity, and not gross receipts, had to be involved in the relied upon transactions to constitute money laundering. *See, e.g., U.S. v Abdulwahab*, 715 F. 3d 521 (4th Cir. 2013) However, in 2009, Congress amended the definition of "proceeds" to explicitly mean "gross proceeds." That amended definition applied to the relied upon transactions in this case, which occurred in 2011 through 2015, and for that reason, transactions that would not have constituted money laundering under *Santos* because they were "the essential expenses of the underlying fraud," specifically payments to promoters, as well as arguably payments to EAI and Golden Strategies, do qualify as money laundering transactions since they involve "gross proceeds" derived from the fraudulent solicitation of lenders. *See id.* at 531–31, n. 8 ("With 'proceeds' now specifically defined, the issue we address today [whether expenses associated with the fraud constitute 'proceeds' for the purposes of the money laundering offense] should not recur in many future cases.")

in the relied upon transactions represented the proceeds from some form of unlawful activity; and with that knowledge joined the conspiracy to further its unlawful objectives.

As to the substantive money laundering counts, the evidence was sufficient to sustain Mr. Millender's conviction for the promotional money laundering charged in Count 12, but not for the concealment money laundering charged in Counts 13, 14, and 20–27. As to Mrs. Millender, the evidence was insufficient to sustain her convictions on concealment money laundering charged in Counts 21, 22, and 27.

In order to sustain a conviction for promotional money laundering under 18 U.S.C. § 1956(a)(2)(A), as alleged in Count 12, the government must prove that: (1) the defendant transported, transmitted, or transferred, or attempted to transport, transmit, or transfer, a monetary instrument or funds; (2) from a place in the United States to or through a place outside the United States or to a place in the United States from or through a place outside the United States; and (3) the defendant did so with the intent to promote the carrying on of specified unlawful activity. *See* Jury Instruction No. 61.

Here, the evidence was sufficient to establish that Mr. Millender used fraudulently obtained funds to promote his scheme through MEMG in violation of §1956(a)(2)(A) when he caused a payment on November, 29, 2011 in the amount of $1,555 from an account associated with EAI, which was located in a place outside the United States, to a MEMG bank account, a place inside the United States, for the purposes of promoting the fraudulent scheme operated through MEMG.

In order to sustain a conviction for concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that: (1) the defendant conducted a financial transaction affecting interstate commerce; (2) the transaction involved the proceeds of specified

unlawful activity; (3) the defendant knew that the property involved was derived from unlawful activity; and (4) the defendant knew that the transaction was designed in whole or in part, to conceal or disguise the nature, location, the source, the ownership, or the control of the proceeds of the unlawful activity. *U.S. v. Blair*, 661 F.3d 755, 764 (4th Cir. 2011).

As to the required *mens rea*, "the government must prove a specific intent to structure a transaction so as to conceal the true nature of the proceeds." *U.S. v. Gilliam*, 975 F.2d 1050, 1056 (4th Cir. 1992) (citations omitted). In that regard, the government must prove more than that the transaction is structured to conceal; it must show that the concealment is "one of the purposes that drove [the defendant] to engage in the transaction in the first place." *U.S. v Faulkenberry*, 614 F. 3d 573, 586 (6th Cir. 2010) (applying to § 1956(a)(1)(B)(i) the holding in *Regalado Cuellar v. United States*, 553 U.S. 550, 563 (2008), which concluded that "when an act is 'designed to' do something, the most natural reading is that it has that something as its purpose."). The government, however, is not required to prove that a defendant himself had the requisite intent to conceal. *United States v. Richardson*, 658 F.3d 333, 340 (3rd Cir. 2011). It is enough to prove that the defendant knew someone else had that purpose. *Id.* (citations omitted). Moreover, courts have repeatedly emphasized that in order to convict for money laundering, there must be evidence of more than simply spending money on ordinary living expenses or even extravagances. *See U.S. Green*, 599 F.3d 360, 373 (4th Cir. 2010). "Spending money is legal. Laundering money by concealing is not." *United States v. Nicholson*, 176 Fed. Appx. 386, 395 (4th Cir. 2006) (cited in *Green,* at 373).

None of the relied upon transactions as to either Defendant was sufficiently structured such that a jury could infer the required *mens rea* for concealment money laundering. None concealed the source of the money (the accounts from which the funds were drawn were not

concealed) and the payments were not otherwise structured or accompanied by circumstances sufficient to raise an inference of an intent or purpose to conceal. *United States v. Hatcher*, 132 F. App'x 468, 479 (4th Cir. 2005) (finding evidence was sufficient to support a concealment money laundering conviction where defendant "artfully structured multiple $9,000 deposits into, and withdrawals from, his and others' account to help [leader of money laundering scheme] pay for the vehicles without being detected."); *see also United States v. Villarini*, 238 F.3d 530, 533 (4th Cir. 2001). The evidence is also insufficient to sustain Mrs. Millender's money laundering convictions since the evidence is insufficient to establish that she knew the "proceeds" were generated from any specified unlawful activities.

Finally, as to Mrs. Millender, given the weight of the evidence, as detailed above, in the event this Order is vacated or set aside as to Mrs. Millender, the Court conditionally orders a new trial as to all reinstated counts of conviction.

For the above reasons, it is hereby

ORDERED that Defendant Terry Millender's Motion for Judgment of Acquittal [Doc. No. 153] be, and the same hereby is GRANTED in part and DENIED in part. It is GRANTED as to Counts 13 and 14, and 20–27 and his convictions on those counts be, and the same hereby are, VACATED and a judgment of acquittal is hereby entered as to those counts; and the Motion is otherwise DENIED; and it is further

ORDERED that Defendant Brenda Millender's Motion for Judgment of Acquittal, or in the Alternative Motion for New Trial [Doc. No. 155] be, and the same hereby is GRANTED and Defendant's convictions on Counts 1,11,15, 19, 21, 22, and 27 be, and the same hereby are, VACATED and a judgment of acquittal is hereby entered as to those counts; provided, however, that pending the filing of any appeal from this Order, Defendant Brenda Millender shall remain

subject to the supervision of the Office of Pre-trial Services and Probation on the same terms and conditions as previously imposed; and it is further

ORDERED that Mr. Millender's sentencing hearing be, and the same hereby is, SCHEDULED for December 14, 2018 at 9:00 am.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to all counsel of record.

/s/
Anthony J. Trenga
United States District Judge

Alexandria, Virginia
September 24, 2018